Filed: 12/8/2025 9:21 AM
Michael Gould
District Clerk
Collin County, Texas
By Angelique Salamanca Deputy
Envelope ID: 108817285

CAUSE NO. <u>416-09562-2025</u>

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| COMMUNITY CAPITAL PARTNERS | § | COLLIN COUNTY, TEXAS |
| LP, EPIC REAL PROPERTIES, INC., | § | |
| EAST PLANO ISLAMIC CENTER, | § | |
| IMRAN CHAUDHARY, NAVEED | § | |
| SIDDIQUI, and SARFRAZ AHMAD, | § | |
| *Defendants*. | § | ___ JUDICIAL DISTRICT |

## VERIFIED ORIGINAL PETITION AND APPLICATION
## FOR A TEMPORARY RESTRAINING ORDER

### I.    Parties, Jurisdiction, and Venue

1.    Plaintiff is the State of Texas.

2.    Defendants are Community Capital Partners LP, EPIC Real Properties, Inc., East Plano Islamic Center, and Messrs. Imran Chaudhary, Naveed Siddiqui, and Sarfraz Ahmad. The participation and role of each are set out in greater detail in the factual recitation that follows.

3.    This action is brought under the Texas Securities Act ("TSA"), which is codified in the Texas Government Code at Title 12, Chapters 4001-4008. Rules regarding the "Authority to Enforce" the TSA are located its Chapter 4007, Subchapter A. More specifically, "administration of the provisions of this title is vested in the [Texas Securities] commissioner," Tex. Gov't Code § 4007.001(a), and the "commissioner and the attorney general shall … ensure that the provisions of this title are obeyed; and … conduct investigations and take measures to prevent or detect a violation of this title," *id*. § 4007.001(b).

4.    The TSA provides that the Attorney General may, upon request from the Commissioner, commence civil proceedings to obtain injunctive relief when a situation of fraud, deception, or misleading statements regarding the sale of a security, or more generally a violation of the TSA, has occurred, is occurring, or is about to occur. In such cases, section 4007.152(a) provides that the Commissioner may request the Attorney General to bring an injunctive relief action against a person or company if it appears to the Commissioner that said person or company:

>     (1)    has engaged, is engaging, or is about to engage in fraud or a fraudulent practice in connection with the sale of a security;

Copy from re:SearchTX

(2)    has engaged, is engaging, or is about to engage in fraud or a fraudulent practice in rendering services as an investment adviser or investment adviser representative;

(3)    has made an offer containing a statement that is materially misleading or is otherwise likely to deceive the public; or

(4) has engaged, is engaging, or is about to engage in an act or practice that violates this title or a board rule or order.

5.    In such an action for injunctive relief, the Attorney General may name as an additional defendant any person who, with intent to deceive or defraud or with reckless disregard for the truth or the law, is aiding such person or company, § 4007.152(b)(1)(B), or one who is "concerned with or in any manner participating in or about to participate in" the described acts and practices, § 4007.152(b)(1)(C). As Plaintiff's investigation advances, additional individuals or entities may be named as defending parties in this action.

6.    The Attorney General may also claim in the same action for injunctive relief damages consisting of "the disgorgement of any economic benefit gained by a defendant through an act or practice that violates [the TSA]." § 4007.153(a)(2).

7.    Further, the TSA permits the Attorney General to seek – again in the same action and in addition to all other remedies – civil penalties to be paid to the State. TSA § 4007.154(a), (b)(1). Such fines can be in an amount up to the greater of $20,000 or the gross amount of any economic benefit realized from the commission of the subject act or practice (when combined with the amount of any previously assessed administrative fine). TSA § 4007.154(a)(1).

8.    Having been requested by the Commissioner to initiate this suit in the name and on behalf of the State, the Attorney General is authorized to proceed in relation to the TSA violations set out hereafter. The facts underlying this application for injunctive relief have been verified by the Commissioner on information and belief in the attached verification, in accordance with Tex. Gov't Code § 4007.152(c).

9.    Jurisdiction and venue for this action lie with a "district court in any county in which it is shown that the acts that are the subject of the application for injunctive relief have been or are about to be committed, or a district court in Travis County." § 4007.152(e). As Collin County is the principal locus of the matters alleged herein, jurisdiction and venue are proper in this Court.

## II.  Factual Background

10.    Community Capital Partners LP ("CCP") is a Texas limited partnership created by the East Plano Islamic Center ("EPIC") as a vehicle to acquire a 402-acre tract of land in Hunt and Collin Counties, with the aim of developing a planned community project dubbed "EPIC City." As envisioned, EPIC City would, when built, host more than 1,000 residential lots, a private school, commercial and retail centers, and a masjid.

2

Copy from re:SearchTX

11.    CCP is managed and controlled by its general partner EPIC Real Properties, Inc. ("EPIC GP"). EPIC GP has one shareholder, EPIC, and a board of directors composed of Messrs. Imran Chaudhary, Naveed Siddiqui, and Sarfraz Ahmad. Each director is an affiliate of CCP, EPIC GP, and EPIC. These individuals and entities are referred to collectively herein as "Defendants."

12.    The Defendants devised a scheme to publicly sell what they described as "shares" which provided an "interest in a limited partnership" (the "Units") and warrants to acquire Units to raise the equity for the development of EPIC City (the "Offering Scheme") to accredited investors. Over 50% of the instruments were sold in Texas and offered pursuant to an offering circular referred to as the "Confidential Private Placement Memorandum" ("PPM," Exhibit I). Under that offering circular, EPIC GP offered 1,000 limited partnership units of CCP priced at $80,000 per Unit. Additionally, the Defendants offered investors the ability to acquire a whole Unit or an additional whole Unit over time.[1] This option was accomplished by selling a half Unit for $40,000 and selling an additional warrant to allow the investor to purchase an additional half Unit for $40,000. Additionally, any investor who initially purchased one whole Unit (but not a purchaser of more than one whole Unit) also received a warrant to purchase one additional Unit. The warrants had to be exercised by January 1, 2025.

13.    As part of the Offering Scheme, the Defendants devised an offering plan and developed related promotional materials to sell shares in the form of limited partnership units and warrants (collectively the "Offered Shares").

14.    CCP's Investor Summary provides information related to the subscription agreements and the structure of the limited partnership.[2] EPIC GP would hold a 0.05% interest in CCP, while a 99.5% interest was to be divided equally among the 500 limited partnership Units. According to the investor summary, each Unit was assigned a 0.1981% limited partner interest. *Id.* at 1-2. (However, the numbers appear to be somewhat off because, first, 500 $x$ 0.1981 % = 99.05% and, second and in any event, 0.05% + 99.5% = 99.55%.)

15.    As part of the Offering Scheme, the Defendants engaged in public meetings and otherwise made a general solicitation of offers for the Offered Shares. Defendants also created a publicly available website[3] to promote EPIC City and, in May 2024, a Facebook page.[4] They further promoted EPIC City by establishing a YouTube channel and posted videos in 2024.[5] Multiple

---

[1] A holder of one whole Unit was guaranteed the opportunity to purchase one property lot at the fair market rate once construction of EPIC City is completed. A holder of 2 whole Units was guaranteed the opportunity to purchase two property lots at the fair market rate once construction of EPIC City is completed. A limited partner was not guaranteed the right to purchase more than two property lots regardless of the number of Units owned. If Epic City was developed and a limited partner exercised its right to acquire a property lot (or 2 lots), the limited partner would receive a credit towards the purchase of the lot equal to the price it paid for the Unit (but no interest was earned on such amount between the purchase of the Unit and the purchase of the lot).

[2] See Exhibit A.

[3] See Exhibit B and https://epicccp.com/

[4] https://www.facebook.com/profile.php?id=61559629274208

[5] See Exhibit C and https://www.youtube.com/@EPICCCP

3

Copy from re:SearchTX

videos were published on the channel before the channel became unavailable to the public. Two videos that were removed from the channel before the channel itself was closed are entitled "Imam Zaid Shakir invites you to Epic City Community"[6] and "Welcome to Epic City Muslim Community #texas #epic2.0 | Dr. Omar Sueliman."[7]

16.     In two other videos ("EPIC Launches EPIC City"[8] and "Welcome to EPIC City"[9]) CCP affirms that the development is "nestled in the heart of Josephine, Texas." But on February 24, 2025, the City of Josephine informed CCP that EPIC City is not within the city limits, the city's extraterritorial jurisdiction, or its utility district.[10] Still, Defendants continued to market the development as being in Josephine, which if true, would allow residents to receive the benefits and amenities provided to Josephine landowners—*e.g.*, existing roads, water, sewer, and other utilities.

17.     As of November 10, 2025, EPIC City had reportedly been rebranded as "The Meadow."[11]

18.     The Defendants claimed in the Investor Summary and PPM that a Municipal Utility District would be created to provide utilities for the Project,[12] but to date no efforts have been made to form a MUD to serve the Project.

19.     On pages 6-7 of the PPM, under the heading "Fees or Distributions to General Partner; Reduction of Distributable Case," the Defendants stated that the EPIC GP would not receive more than $1 million for standard operating costs, but on information and belief as of June 25, 2025, EPIC GP had already received in excess of $1 million for general operating expenses, despite the fact that relatively little had been done to move the project forward, apart from the acquisition of the land and some efforts to market the offering. In addition, despite this limited progress, Defendant Chaudhary, who holds himself out as President of Epic Real Properties, Inc., is on information and belief receiving $30,000 per month from the offering proceeds, despite having professed in promotional materials that he serves only as a volunteer, that he was not getting paid, and that he would not accept any salary or compensation whatsoever.

20.     The "EPIC Launches EPIC City" video describes the community as "a project that's going to change ... the Dawah scene for the Muslim community in the US."[13] In the "Imam Zaid Shakir invites you to Epic City Community" video, Imam Zaid Shakir states that EPIC City will be "exponentially beneficial … to the believers ... a greater sign that [the Muslim] community has

---

[6] See Exhibit D.

[7] See Exhibit E.

[8] See Exhibit F.

[9] See Exhibit G.

[10] See Exhibit H.

[11] https://www.keranews.org/business-economy/2025-11-10/east-plano-islamic-center-epic-city-meadow

[12] See Exhibit A at 1, Exhibit I at 1.

[13] See Exhibit F.

Copy from re:SearchTX

arrived," and that EPIC City will serve as the "epicenter of Islam in North America."[14] Moreover, although no longer publicly accessible, the video found at Exhibit E bore the title "Welcome to Epic City Muslim Community #texas #epic2.0 | Dr. Omar Sueliman" (emphasis added).[15]

21.    Furthermore, while a subsequent version of EPIC City's website stated that the project is "committed to building a vibrant, multigenerational and inclusive master planned community," the website's language from 11 days after CCP's initial announcement was significantly different: a screenshot of the website from May 26, 2024, shows that the mission statement originally stated that EPIC City was "committed to building a vibrant and inclusive community that serves the evolving needs of the **Muslim** community."[16] This language was still active on EPIC City's homepage until at least February 14, 2025, long after the offering was announced and after hundreds of subscription agreements had become effective.[17]

22.    These videos, and the overall marketing campaign more broadly, give the clear impression that EPIC City is a community targeted at and reserved for those of the Muslim faith.

23.    Months after it had begun marketing its shares offering, CCP on March 18, 2024 filed a "Form D" with the United States Securities and Exchange Commission ("SEC").[18] The ostensible purpose of the Form D filing was to perfect a purported exemption under SEC Rule 506 promulgated under the Securities Act of 1933, as amended ("Rule 506"), in particular under Rule 506(c).[19] CCP filed a Form D notice with the Texas State Securities Board ("TSSB") on April 8, 2024.[20]

24.    By letter of April 1, 2025, the TSSB requested that CCP furnish certain documents and respond to questions concerning EPIC City. The requests sought information related to marketing, lists of the investors, proof of CCP's verification of the accredited status of investors, and financial records.[21]

25.    Section 2 of the CCP subscription agreement[22] indicates that the minimum investment is $40,000 for a one-half Unit.

---

[14] See Exhibit D.

[15] See Exhibit C.

[16] See Exhibit J.

[17] See Exhibit K.

[18] See Exhibit L.

[19] 17 CFR § 230.506(c)(2)(ii). Rule 506(c) allows companies to raise an unlimited amount of capital by means of general solicitation when (a) *all* investors are "accredited" within the meaning of the Securities Act of 1933, and (b) the issuer has taken "reasonable steps" to verify the accredited status of each purchaser.

[20] See Exhibit M.

[21] See Exhibit N.

[22] See Exhibit I.

Copy from re:SearchTX

26.     Section 4(e) of the CCP subscription agreement provides that "this Subscription Agreement shall be deemed to be accepted by the Partnership only when it is signed by the General Partner on behalf of the Partnership."

27.     An internal spreadsheet furnished by CCP in response to the TSSB's requests reflects that 335 investors each paid $40,000 or more and that hundreds of Offered Shares have been sold.[23]

28.     In addition, and importantly, documents provided to TSSB by CCP reflect that for at least 9% of those investors CCP did not properly verify or document their status as "accredited investors," as required by Rule 506(c).[24]

### III. Legal Background and Causes of Action

A.  Overview

29.     Generally, under Texas law, a person may not offer or sell securities in Texas unless the Texas Securities Commissioner has issued a permit to the securities issuer or registered dealer qualifying those securities for sale, or unless the securities themselves or the offering or sale is exempt. TSA § 4003.001. Notwithstanding the general rule, a security offered in accordance with Rule 506 is exempt from state registration requirement except for filing a Form D and paying any applicable fees.[25] Rule 506 is part of the SEC's Regulation D.

30.     But because CCP failed to comply with Rule 506, the issuance did not fall into that Rule's safe harbors.

B.  SEC Regulation D

31.     The Securities Act of 1933 makes it unlawful to issue securities without filing a registration statement, save for in cases in which an exemption from registration applies. 15 U.S.C. § 77e(c).[26] A dispensation from the registration requirement, referred to as the "Section 4(a)(2) exemption" (and formerly known as the "Section 4(2) exemption"), exists for "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2).

---

[23] See Exhibit O.

[24] See Exhibit P.

[25] 15 U.S.C. § 77r(c)(2)(A).

[26] "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8 [15 USCS § 77h]."

Copy from re:SearchTX

32.     Acting under the authority granted to it in the Securities Act, the Securities and Exchange Commission promulgated a series of rules concerning private offering exemptions. They are organized in what is known as Regulation D (entitled "Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933"). Regulation D's registration exemptions constitute safe harbors under Section 4(a)(2) of the Securities Act. In other words, offerings to which Regulation D applies are deemed not to be public offerings.[27]

33.     "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public."[28] Consistent with this, to avoid liability for the sale of an unregistered security, the seller bears the burden of proof to demonstrate the applicability of an exemption that allows the offering to be characterized as not a public offering.[29]

34.     What this means, in practice, is that the seller must produce evidence relating to *each* investor's status as an accredited investor and/or its sophistication in investment matters. "In order to come within the Rule 506 safe harbor, FSC [the broker dealer appellee] is required to offer evidence of the issuer's reasonable belief as to the nature of *each* purchaser. Thus, for purposes of Rule 506, what [the issuers] knew and reasonably believed about each purchaser is critical."[30]

### 1.     SEC Rule 506(c)

35.     The Defendants failed to comply with Rule 506(c), and therefore it is unavailable to escape the Securities Act of 1933's registration requirements. While Rule 506(c) allows the use of general solicitations and advertising to raise capital, it sets out as a condition to such an approach that "*[a]ll* purchasers of securities in any offering under [the Rule 502(c) exception] are accredited investors."[31] And the Regulation obliges the issuer to take "reasonable steps" to verify that each purchaser is an "accredited investor."[32]

36.     Regulation D, Rule 501 defines the term "accredited investor." Individuals qualify for this characterization in several ways, including most commonly via 17 CFR § 230.501(a)(5) ("[a]ny natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000") and § 230.501(a)(6) ("[a]ny natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with

---

[27] *See McKim v. Newmarket Techs., Inc.*, 370 Fed. Appx. 600, 604-05 (6th Cir. 2010).

[28] *S.E.C. v. Cavanagh*, 445 F. 3d 105, 115 (2d Cir. 2006).

[29] *Mark v. FSC Sec. Corp.*, 870 F.2d 331, 333 (6th Cir. 1989); *Kunz v. SEC*, 64 Fed. Appx. 659, 666, 667 (10th Cir. 2003); *Andrews v. Blue*, 489 F.2d 367, 374 (10th Cir. 1973).

[30] *Mark*, 870 F.2d at 335 (emphasis in original).

[31] 17 CFR § 230.506(c)(2)(i) (emphasis added); *see also SEC v. Telegram Grp. Inc.*, 448 F. Supp.3d 352, 366 (S.D.N.Y. 2020) ("To make use of this safe harbor, Rule 506(c) requires that the relevant securities *are sold only to accredited investors ….*" (emphasis added)).

[32] § 230.506(c)(2)(ii) ("The issuer shall take reasonable steps to verify that purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors.").

7

Copy from re:SearchTX

that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year").

37.    Under Rule 506(c), the issuer's reasonable verification of accredited investor status can consist of, for status based on <u>income</u>, "reviewing any Internal Revenue Service form that reports the purchaser's income for the two most recent years … and obtaining a written representation from the purchaser that he or she has a reasonable expectation of reaching the income level necessary to qualify as an accredited investor during the current year." [33]

38.    Concerning a claim to "accredited investor" status based on <u>net worth</u>, the seller's reasonable investigation can consist of reviewing certain types of "documentation dated within the prior three months and obtaining a written representation from the purchaser that all liabilities necessary to make a determination of net worth have been disclosed," where: (i) for assets, the acceptable forms of documents are "[b]ank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments, and appraisal reports issued by independent third parties," [34] while (ii) for liabilities, the issuer is required to inspect "[a] consumer report from at least one of the nationwide consumer reporting agencies." [35]

39.    An issuer may also rely on a "written confirmation" of a purchaser's status as an accredited investor issued by certain broker-dealers, investment advisers, attorneys, and CPAs and indicating that they have taken reasonable steps to verify the investor's status as an accredited investor within the prior three months. [36]

40.    Rule 506(c) provides that employing one of the listed avenues for verifying "accredited investor" status allows an issuer to satisfy its obligation of diligence ("reasonable steps to verify") only when "the issuer does not have knowledge that such person is not an accredited investor." Finally, an issuer does not meet its burden of proving it took reasonable steps to verify "accredited investor" status when it merely relies on representations by purchasers about their status. [37]

41.    The evidence in Plaintiff's possession shows that CCP fell significantly short in satisfying its duty to take reasonable steps to verify purchasers' status as accredited or non-accredited investors. Plaintiff's initial review of the documentation furnished to the Attorney General reveals that for around at least 9% of purchasers, either the documentation furnished does not support even

---

[33] Rule 506(c)(2)(ii)(A).

[34] Rule 506(c)(2)(II)(B)(1).

[35] Rule 506(c)(2)(ii)(B)(2).

[36] Rule 506(c)(2)(ii)(C)(1-4).

[37] *SEC v. Earle*, 751 F. Supp.3d 1044, 1053, 1054 (S.D. Cal. 2024) (collecting cases; "The verification obligation was implemented to depart from a status quo that permitted investors to self-certify their eligibility to purchase the offered securities, and thus, permitted the issuers to rely on that self-certification. To hold that an issuer can verify investors' representations of their accredited status by relying on those very representations would defeat the purpose of the verification requirement."); *see also Esebag v. Whaley*, No. LA CV18-08446 JAK (RAOx), 2020 U.S. Dist. LEXIS 247271, at *32 (C.D. Cal. Sept. 8, 2020); *Esebag v. Whaley*, No. LA CV18-08446 JAK (RAOx), 2023 U.S. Dist. LEXIS 245574, at *43 (C.D. Cal. Apr. 27, 2023).

8

Copy from re:SearchTX

a *prima facie* claim to their being accredited investors, or else the verification documentation is wholly lacking. Yet the terms of Rule 506(c) make clear that the registration exception applies only when *all* investors are accredited.[38]

42.    The Rule 506(c) exemption is therefore inapplicable, and CCP cannot rely on it to escape TSSB oversight of its securities issuance.

### 2.    SEC Rule 506(b)

43.    Rule 506(b) sets out a separate exemption from the SEC's registration requirement. While CCP did not invoke the Rule 506(b) exemption in its Form D, even if it had, the exemption would nevertheless have been unavailing. To qualify for the Rule 506(b) safe harbor, offers and sales must first satisfy the "general conditions" of §§ 230.501 and 230.502. Rule 501 sets out applicable definitions (including that of "accredited investor" seen above), while Rule 502 identifies the types of information that must be provided with a Regulation D offering. Rule 506(b)'s "specific conditions," in turn, identify limitations on both the number and nature of the purchasers.

44.    Concerning the number of purchasers, for the Rule 506(b) safe harbor to apply, there may be no more than, or the issuer must reasonably believe there are no more than, 35 purchasers of securities in any 90-calendar day period.[39] When the limit of 35 purchasers of the unregistered securities is exceeded, this exemption under Section D is no longer available.[40] "Accredited investors" are excluded from the count of purchasers under § 230.506(b).[41]

45.    Turning to Rule 506(b)'s limitation on the nature of the purchasers, the relevant statutory language reads: "Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) *has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment*, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description."[42]

46.    CCP has provided no evidence that it confirmed that each of the many purchasers that are not accredited investors – including any investor for whom CCP submitted improper documentation of "accredited investor" status, as well as any for whom no documentation was submitted – was nevertheless an investor having "such knowledge and experience in financial and

---

[38] 17 CFR § 230.506(c)(2)(i): "Nature of purchasers. All purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors."

[39] 17 CFR § 230.506(b)(2)(i); *Battig v. Simon*, 2001 U.S. Dist. LEXIS 22318 (D. Or. Dec. 6, 2001).

[40] *Kunz*, 64 Fed. Appx. at 666.

[41] 17 CFR § 230.501(e)(1)(iv); *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017).

[42] § 230.506(b)(2)(ii) (emphasis added); *McKim*, 370 Fed. Appx. at 605 ("Rule 506 is limited to those considered to be accredited investors and sophisticated non-accredited investors."); *Buist v. Time Domain Corp.*, 926 So. 2d 290, 295 (Ala. 2005) ("the purchaser must have some sophistication in investing"); *see also State v. Casper*, 297 S.W.3d 676, 686 (Tenn. 2009); *Cordius Trust v. Kummerfeld* (In re *Kummerfeld*), 444 B.R. 28, 45-46 (Bankr. S.D.N.Y. 2011).

Copy from re:SearchTX

business matters that he is capable of evaluating the merits and risks of the prospective investment" or that CCP reasonably believed each non-accredited investor matched that description.

47.    For this reason, CCP cannot rely on the safe harbor of Rule 506(b).

48.    Further, the limits on the scope of the Rule 506(b) exemption created by its terms are consistent with the "[l]imitation on manner of offering" contained in 17 CFR § 230.502(c), which provides that "neither the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including […] [a]ny advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio [and] [a]ny seminar or meeting whose attendees have been invited by any general solicitation or general advertising."[43] To claim a registration exemption under Rule 506(b), CCP would, in short, have needed to refrain from engaging in general solicitation or general advertising. It did not.

49.    The TSSB requested that CCP furnish copies of promotional materials used in its marketing campaigns. CCP responded with a link to its website and links to three separate YouTube videos. In its investigation, the Office of the Attorney General found additional evidence of promotional efforts that were not disclosed – specifically, marketing campaigns launched via Facebook and X. The number and breadth of these marketing efforts confirm that CCP violated Rule 506(b)'s prohibition on issuers (or on any person acting on their behalf) to offer or sell securities by any form of general solicitation or general advertising.

50.    Additionally, CCP hosted a public meeting on February 18, 2024, before any sales had been executed, to announce EPIC City to potential investors. CCP's social media posts and website publications constitute still further proof that CCP violated Rule 506(b)'s prohibition on general solicitation.

51.    CCP's proceeding by way of general solicitation constitutes an additional reason why CCP cannot invoke Rule 506(b)'s registration exemption.

*        *        *

52.    The exemptions of Rule 506 being inapplicable, CCP remains subject to the legal regime set out in the TSA.

B.  <u>Texas Securities Act</u>

53.    Rule 506 preempts state laws that require the registration of securities.[44] But since neither of the Rule 506 exceptions discussed above applies here, federal preemption does not apply to the

---

[43] 17 CFR § 230.502(c) expressly identifies the Rule 506(c) exemption discussed above as an exception to the prohibition on general solicitation.

[44] *Consolidated Mgmt. Grp., LLC v. Department of Corporations*, 162 Cal. App. 4th 598, 606-08 (Cal. 1st Dist. Ct. App. 2008).

10

Copy from re:SearchTX

registration question, and CCP was subject to all the TSA's strictures governing securities registration.[45]

54.     The Texas Securities Act, which is codified in the Texas Government Code at Title 12, has as one of its leading purposes to "protect investors and, consistent with that purpose, encourage capital formation, job formation, and free and competitive securities markets."[46]

55.     Broadly speaking, the TSA "imposes liability on a 'person' who offers or sells a security in violation of the registration requirements or by means of an untrue statement or omission of a material fact," while also criminalizing such conduct.[47] A limited partnership interest is a "security" under the TSA.[48]

56.     As described below, CCP has violated several provisions of the TSA.

Count One: Dealer Registration

57.     TSA § 4004.051 (entitled "Registration of Dealers Required") provides that "[a] dealer or other person or company … *may not*, directly or through the dealer's or other person's or company's agents, offer for sale, sell, or make a sale of any securities … *unless the dealer or other person or company is first registered*" with the commission under Chapter 4004's prescribed application process (emphasis added).[49]

58.     A "dealer" is defined to include "a person or company, other than an agent, who for all or part of the person's or company's time engages in this state, directly or through an agent, in selling, offering for sale or delivery, soliciting subscriptions to or orders for, undertaking to dispose of, or inviting offers for any security" and, more generally, "a person or company who deals in any other manner in any security in this state."[50]

---

[45] *Cf. Buist v. Time Domain Corp.*, 926 So. 2d 290, 294-98 (Ala. 2005); *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 911-12 (6th Cir. 2007); *Risdall v. Brown-Wilbert, Inc.*, 753 N.W.2d 723, 727-29 (Minn. 2008).

[46] § 4001.002(a)(1).

[47] *Christie v. Hahn*, No. 05-20-01045-CV, 2022 Tex. App. LEXIS 6129, at *14 (Tex. App.—Dallas Aug. 19, 2022, no pet.); *Carter v. State*, No. 05-22-00600-CR, 2024 Tex. App. LEXIS 2318, at *6 (Tex. App.—Dallas Apr. 2, 2024, pet. ref'd); *Davis v. MSR Holdings, LLC*, No. 01-22-00451-CV, 2024 Tex. App. LEXIS 4552, at *40 n.7 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied).

[48] § 4001.068(a)(1)(A).

[49] *See Texas St. Sec. Bd. v. KP Financials, LLC et al.*, SOAH Docket No. 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, 2022 TX SOAH LEXIS 2, at *26 (Tex. St. Off. of Admin. Hrgs, Feb. 10, 2022).

[50] § 4001.056(a); *Carr v. Barnett*, No. 3:18-CV-03109-N, 2022 U.S. Dist. LEXIS 89196, at *19-20 (N.D. Tex. May 18, 2022).

11

Copy from re:SearchTX

59.     Subsection 4001.056(b) provides that "an issuer, other than a registered dealer, who directly or through any person or company, other than a registered dealer, offers for sale, sells, or makes sales of the issuer's own securities is deemed a dealer and shall comply with this title."[51]

60.     CCP never registered with the Texas Securities Commissioner, as it was required to do by the TSA.[52]

Count Two: Issuance Permit and Offer Filing Requirements

61.     Under § 4003.001 of the Act (entitled "Permit Required; Exceptions"), a "dealer or agent may not sell or offer for sale any securities … *unless the [Securities] Commissioner has issued a permit* qualifying securities for sale for those securities to the issuer of the securities or a registered dealer" (emphasis added).[53] This provision is subject to certain exceptions,[54] none of which apply here.

62.     Additionally, TSA § 4003.003 requires a statement of financial condition and an income statement to be filed with the Commissioner. The statement of financial condition must include a detailed enumeration the issuer's liabilities and assets complying with the standards spelled out in the Act. Texas Securities Board Rule 113.5 requires financial statements to be audited by an independent certified public accountant or an independent public accountant.

63.     Further, Rule 113.14 directs the Securities Commissioner, where applicable, to utilize the criteria contained in specific North American Securities Administrators Association ("NASAA") Statements of Policy, *inter alia* "Specificity in Use of Proceeds, as amended by NASAA on September 11, 2016." The offering material would have had to contain detailed information about the estimated amount to be used for each purpose and the order of priority in which the issuer would use the proceeds for the stated purposes. NASAA Statement of Policy Regarding Specificity in Uses of Proceeds at IV. Further, the issuer would have been required to demonstrate that the offering proceeds were sufficient, together with other sources, to sustain the issuer's proposed activities. The Real Estate Programs statement of policy also requires that written or prepared

---

[51] While § 4001.056(c) provides that an issuer is not considered a dealer in certain limited circumstances, none of the referenced exceptions (which are set out in TSA Subchapter 1, Chapter 4005) is applicable.

[52] EPIC GP wrongly claims in the PPM that CCP is exempt from registering as an investment company because it "primarily engages in the purchasing or otherwise acquiring mortgages and other liens on and interests in real estate." PPM at 7. Limited partnerships formed and operated for the primary purpose of investment in and the operation of, or gain from, an interest in real property are required to be registered. In addition, they are subject to the further required disclosures of the NASAA Statement of Policy for Real Estate Programs. NASAA's Statement of Policy Regarding Real Estate Programs, as amended on May 7, 2007.

On the criminal law front, TSA § 4007.201(a) prohibits a person from selling, offering for sale, soliciting subscriptions to or orders for, disposing of, inviting orders for, or dealing in any other manner in a security, *unless that security has been registered with the Commission, or a permit has been issued qualifying it for sale*. The offense of unauthorized sale of a security under § 4007.201 is a third-degree felony.

[53] *Carr*, 2022 U.S. Dist. LEXIS 89196, at *16; *KP Financials*, 2022 TX SOAH LEXIS 2, at *26.

[54] Securities registered "by notification" or "by coordination," under Subchapters B and C, respectively, and transactions exempt under Chapter 4005.

12

Copy from re:SearchTX

audiovisual presentations to be given at any meeting about the issuance be submitted to the Commissioner no less than three business days prior to said meeting.

64.    Notwithstanding the requirements of § 4003.001, CCP did not seek or obtain a permit from the Texas Securities Commissioner authorizing the issuance of the securities at issue.

65.    Nor, as described in the paragraphs that follow, did CCP apply for the authorization required to proceed with its written and oral marketing campaigns for its securities offering.

66.    Indeed, § 4003.203 of the Act ("Authorized Written, Printed, or Broadcast Offers") requires a number of cumulative conditions to be fulfilled in relation to any printed offer concerning a security. Among other conditions, a copy of the offer must be filed with the Commissioner within 10 days of the offer's first being made in the State, and the person disseminating the offer must be a registered dealer or registered agent of a registered dealer. Additionally, the security must already have been registered via notification or coordination, or a permit must already have issued qualifying the security for sale, or an application for registration or for a permit must be pending with the Commissioner. Further still, and importantly, a written or printed offer to sell a security may be made only in cases where "payment is not accepted from the offeree and no contract of sale is made before registration of the security is effective … or a permit is issued." § 4003.203(6).

67.    CCP did not comply with these rules applicable to written, printed, or broadcast offers; it simply proceeded instead to issue the securities.

68.    In response to an inquiry from the TSSB, CCP provided links to its website and YouTube videos. But, as noted above, the Texas Attorney General discovered the existence of additional promotional efforts made through Facebook and X.

69.    Moreover, as noted, CCP held a public meeting on February 18, 2024 to invite investment. The recording of this meeting was subsequently posted by CCP to its YouTube channel. In fact, CCP published no fewer than five YouTube videos after creating its account in February 2024.

70.    Finally, CCP created social media accounts and made posts that set out contact information for the EPIC City investment and encouraged investors to "Call now to place your appointment." Another read: "Dreaming of becoming a shareholder in a lucrative real estate development? Here's your chance! Invest now and secure a developed lot with our exclusive offer."[55]

71.    CCP's failure to comply with the applicable permitting and registration requirements when distributing written materials and broadcasting offers soliciting participation in its securities offering constituted a violation of TSA § 4003.203.[56]

---

[55] See Exhibit Q.

[56] A criminal offense is committed under TSA § 4007.207(a)(1) when a person offers a security without complying with the quoted provisions of TSA § 4003.203. An offense under § 4007.207(a) is a state jail felony.

13

Copy from re:SearchTX

Count Three: Fraudulent Conduct Relating to a Security

72.     As seen above, the TSA at § 4007.152(a) allows the Attorney General to bring proceedings for injunctive relief when fraud, deception, or misleading statements regarding the sale of a security, or more generally a violation of the TSA, has occurred, is occurring, or is about to occur.

73.     TSA § 4001.058 defines "fraud" and "fraudulent practice" to include:

(1)     a misrepresentation of a relevant fact made in any manner;

(2)     a promise, representation, or predication as to the future not made honestly and in good faith;

(3)     an intentional failure to disclose a material fact;

(4)     a direct or indirect gain, through the sale of a security, of an underwriting or promotion fee or profit, or of a selling or managing commission or profit, that is so gross or exorbitant as to be unconscionable; and

(5)     a scheme, device, or other artifice to obtain a profit, fee, or commission described by Subdivision (4).

74.     Texas jurisprudence instructs that the TSA's fraud provisions are remedial in nature and should receive the widest possible scope.[57]

75.     Separately, section 4007.203 of the TSA creates the offense of *fraudulent conduct relating to a security*. Under this provision's terms, an offense is committed if, in connection with the potential or actual sale of a security, a person directly or indirectly, *inter alia*, engages in any fraud or fraudulent practice, knowingly makes an untrue statement of a material fact or omits to state a material fact needed for the person's other statements not to be misleading, or engages in any practice that operates as a fraud or deceit on any person.[58]

76.     CCP misrepresented a number of relevant facts to its investors.

a.    Representations Concerning EPIC City's Location

77.     For over a year, CCP represented to potential and actual investors that the development is "nestled in the heart of Josephine, Texas."[59] This statement, which can be found in CCP's YouTube video entitled "Welcome to EPIC City" (which was viewed more than 8,800 times[60]), is false and misleading, because EPIC City is not in the city limits, the extra-territorial jurisdiction,

---

[57] *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

[58] § 4007.203(a); *see, e.g., Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 837 (Tex. 2005).

[59] See Exhibits F and G.

[60] See Exhibit R.

14

Copy from re:SearchTX

or the utility district of Josephine, Texas. EPIC City is located, rather, in unincorporated portions of Collin and Hunt Counties.

78.    On February 24, 2025, Lisa Palomba, the Josephine City Administrator, contacted CCP and asked it to correct its advertising.[61] But CCP took no action in response to correct the advertising, leading to a press release by the city to clarify confusion.[62]

79.    This misrepresentation would lead any reasonable investor to expect that future residents of EPIC City would have access to the municipal resources of Josephine, Texas.

80.    Following the request by Josephine, eight investors paid their second installment of $40,000 and two investors purchased a full share for $80,000. This demonstrates that even after being made aware of a significant misrepresentation concerning the development's location and attributes, CCP chose not to correct marketing materials that misrepresented a relevant fact.

81.    Further, CCP's decision to maintain its advertisements purporting that EPIC City is "nestled in the heart of Josephine, Texas" after being made aware of that claim's falsity constitutes "a promise, representation, or predication as to the future not made honestly and in good faith" to those ten investors, establishing a clear violation of the Texas Security Act's prohibition on fraudulent conduct.

   b.   Representations Concerning Imran Chaudhary's Compensation

82.    On February 18, 2024, prior to the offering of securities by CCP, EPIC published a video on the masjid's YouTube channel entitled "EPIC Real Properties, Inc., The General Partner of Community Capital Partners LP | Q&A."[63] As of November 25, 2025, this video had been viewed more than 9,000 times.[64]

83.    In this video, Imran Chaudhary, the CEO of CCP and EPIC GP (the General Partner for the offering), stated, "I will only be doing this as a volunteer. I'm not getting paid, and I will not take any salary or any compensation for being a president of this entity." When asked to clarify the statement that he would not make "any profit whatsoever," Imran Chaudhary replied that he would receive "no profit at all." Asked a third time to state his position, Mr. Chaudhary said that he would not receive "even a single cent."

84.    Despite this public, unequivocal representation, on March 1, 2025 Imran Chaudhary entered into an independent contractor agreement with CCP (the "Chaudhary Agreement") through his company, Tradition Trust, LLC. The agreement provides that CCP will pay Tradition Trust, LLC, $360,000 per year, in twelve monthly installments, to retain the company as its Chief

---

[61] See Exhibit H.

[62] See Exhibit S.

[63] https://www.youtube.com/watch?v=kWc1kx4ad1U

[64] See Exhibit T.

Copy from re:SearchTX

Executive Officer.[65] The agreement "acknowledge[s] that Imran is the sole member of the Contractor and is also the President of the Company."[66] Imran Chaudhary is the managing member of Tradition Trust, LLC.[67]

85.    In April 2025, Community Capital Partners published the February 2024 Q&A video on its YouTube channel, allowing future potential investors to learn more about the project from the CEO of CCP and EPIC GP.[68] In republishing the video, CCP reaffirmed the statements of its CEO that he was serving without compensation. A reasonable investor would take Mr. Chaudhary's promise that he would derive no financial advantage from his role as truthful.

86.    Yet it proved to be a false statement. By April 2025, Imran Chaudhary had already received his first $30,000 compensation installment, per the Chaudhary Agreement.

87.    In response to a TSSB inquiry, CCP claimed that the EPIC GP board of directors realized that the scope of the EPIC City development project required that such an agreement be executed. CCP cited various provisions of its PPM that afforded general partner EPIC GP the latitude to enter into such an agreement.[69]

88.    Still, investors had been assured in unambiguous terms that their investments would be handled differently – and not solely in the February 2024 Q&A video.

89.    For example, CCP's investor summary states that CCP "intends to donate to EPIC one hundred percent (100%) of the net proceeds from *the sale of Lots*, all to further the objectives of the Masjid."[70] As for CCP's Private Placement Memorandum, it states that the "Partnership currently intends to *make no distribution of cash*, unless, in the sole discretion of its General Partner, the Partnership has cash in excess of its working capital requirements."[71] The PPM also states that "the Partnership intends to […] (ii) donate all net proceeds from lot sales, and all other sales, to the Masjid."[72]

90.    It is further specified in the PPM that the "net proceeds of this Offering will be used for the purposes described under the section entitled 'USE OF PROCEEDS,'" and CCP also reserves the right to use the funds for "other similar purposes not presently contemplated in this Memorandum which it deems to be in the best interests of the Partnership and its Limited Partners in order to address any changed circumstances or opportunities." The purposes described under the "USE

---

[65] See Exhibit U.

[66] See *Id* at 4.1.

[67] See Exhibit V.

[68] See Exhibit R.

[69] See Exhibit W at item 13.

[70] See Exhibit A, page 3.

[71] See Exhibit I, page 2.

[72] See *Id.,* page 4.

16

Copy from re:SearchTX

OF PROCEEDS" section provide that funds will be used "by the Partnership for the acquisition of the Property, to develop the Project, fund the MUD, and as general working capital."[73]

91.    Finally, Imran Chaudhary himself stated in the Q&A video that CCP "intends to donate" all net proceeds from the sales of lots to EPIC, "all to further the objectives of the Masjid."[74]

92.    Whether CCP would, absent this particular factual context, be within its rights to hire Mr. Chaudhary is irrelevant to the scope of this cause of action. CCP stated repeatedly throughout its documentation that the purpose of the Partnership was to purchase land and develop EPIC City, and that its intention was to "donate all net proceeds *from lot sales, and all other sales*, to the Masjid." This is the same position articulated by Imran Chaudhary on February 18, 2024 in his Q&A video.

93.    Further, when it posted the Q&A video to its separate YouTube page in April, 2024, CCP reaffirmed its stance that its CEO would not receive "a cent" for his role in EPIC City and that it intended to donate all proceeds to EPIC. Notably, this reaffirmation came *after* the contract was signed.

94.    A reasonable potential investor would take the intentions spelled out in the publicly available Investor Summary and PPM as written. The same reasonable potential investor would also take at face value Imran Chaudhary's stated intent to donate all proceeds to EPIC Masjid and his repeated promise that he would not receive compensation.

95.    In a written response to TSSB, CCP stated that it had not made any written disclosures to its investors concerning the Chaudhary Agreement but claimed that some investors had been notified in Zoom meetings.[75]

96.    After the original video was posted on EPIC Masjid's YouTube channel, CCP received investments from 335 investors. Since the video was reposted on CCP's YouTube channel in April, 2025, it has received investments from six individuals.[76]

97.    To date, CCP has failed to inform potential investors that Imran Chaudhary is receiving an annual salary of $360,000, in direct contradiction to the representations identified above.

98.    Publishing the Q&A video a month after CCP entered into a contract with Mr. Chaudhary constitutes "a promise, representation, or predication as to the future not made honestly and in good faith" to those six investors, establishing a violation of the Texas Security Act's prohibition on fraudulent conduct.

---

[73] See *Id.,* page 2.

[74] https://www.youtube.com/watch?v=kWc1kx4ad1U at 3:50.

[75] See Exhibit X, item 13.

[76] See Exhibit O.

17

Copy from re:SearchTX

## IV. Prayer

99.     Through this Petition, Plaintiff seeks both a temporary restraining order and permanent injunctive relief against all Defendants under the TSA and Texas law more generally.

100.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

101.    All conditions precedent have been performed, waived, or have occurred.

102.    Defendants have performed, are continuing to perform, and are about to perform acts relating to the subject of this litigation that are in violation of the TSA. The State of Texas seeks temporary and permanent injunctive relief against Defendants to restrain them from their continued violation of the TSA.

103.    A temporary injunction serves to preserve the status quo of the subject matter until a trial on the merits. *Clint ISD v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). Injunctive relief is available when an applicant shows that it has a cause of action against the defendant, that it has a probable right to the relief sought, and that imminent and irreparable harm will probably ensue absent such relief. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

104.    The legal foundations for Plaintiff's claims under the TSA are set out in detail above. The requirement that a TRO applicant show a probable right to relief is not tantamount to having to establish that it will prevail at trial. Instead, the applicant need only show that it "ha[s] a cause of action for which [it] may be granted relief." *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577; *id.* at 576 (Tex. App.—Austin 2008, no pet.). Finally, probable harm is imminent, and any injury therefrom irreparable, given, *inter alia*, that Defendants hold massive sums of money obtained from investors, yet the promised investment project appears stalled, and evidence suggests that Defendants may be expending the investors' money in ways that contradict the project vision set out in the promotional materials disseminated by Defendants to prospective investors.

105.    For all of the foregoing reasons, Plaintiff the State of Texas respectfully requests that the Court enter one or more orders granting it both temporary and final relief as follows:

1.  A declaration that the safe harbors of 17 CFR § 230.506(b) and 17 CFR § 230.506(c) are inapplicable under the present facts.
2.  A declaration that East Plano Islamic Center, EPIC Real Properties, Inc., and Community Capital Partners, operating through the board of directors composed of Messrs. Imran Chaudhary, Naveed Siddiqui, and Sarfraz Ahmad, falsely claimed the safe harbor exemption of 17 CFR § 230.506(c).
3.  A declaration that EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors violated TSA § 4004.051 ("Registration of Dealers Required").
4.  A declaration that EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors violated TSA § 4003.001 ("Permit Required; Exceptions").

18

Copy from re:SearchTX

5.  A declaration that EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors violated TSA § 4003.203 ("Authorized Written, Printed, or Broadcast Offers").

6.  A declaration that EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors engaged in fraudulent practices within the meaning of, *inter alia*, TSA §§ 4001.058 and 4007.152.

7.  The appointment of a receiver for EPIC Real Properties, Inc. and Community Capital Partners, to conserve and protect assets for the benefit of security holders under § 4007.151.

8.  An injunction suspending the issuance of any further securities on this project, under § 4007.152(b)(2).

9.  An injunction suspending EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors from acting as securities dealers or agents in Texas until they are registered with the Securities Commissioner, under § 4007.152(b)(2).

10. An injunction suspending EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors from engaging in fraud in connection with the offer for sale of any security in Texas, under § 4007.152(b)(2).

11. An injunction suspending EPIC Real Properties, Inc., Community Capital Partners, and EPIC's directors from offering securities in Texas through an offer containing a statement that is materially misleading or otherwise likely to deceive the public, under § 4007.152(b)(2).

12. An injunction ordering the immediate retraction of all materials purporting that EPIC City is "nestled in the heart of Josephine, Texas" or containing any like statement, and requiring CCP to contact all investors to rectify this misrepresentation.

13. An order to Defendants to disgorge ill-gotten gains and benefits obtained as a result of the violations alleged herein, under § 4007.153.

14. A civil penalty not exceeding $20,000 per violation when totaled with any administrative fine previously assessed by the Commissioner, under § 4007.154(a), (b).

15. An order awarding Plaintiff all other just relief to which it may be entitled in law or equity.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

19

Copy from re:SearchTX

KIMBERLY GDULA
Chief, General Litigation Division

/s/ *Thomas Bevilacqua*
**Thomas Bevilacqua**
Texas Bar No. 00793342
Assistant Attorney General
Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(737) 224-2489 **|** FAX: (512) 320-0667
thomas.bevilacqua@oag.texas.gov

20

Copy from re:SearchTX

## UNSWORN DECLARATION OF TRAVIS J. ILES

My name is Travis J. Iles. I am over the age of eighteen years and of sound mind. I am competent and authorized to make this unsworn declaration. I serve as the Texas Securities Commissioner, a position I have held since my appointment in 2017.

I am familiar with many of the allegations set out in the Petition that this unsworn declaration accompanies. By March 27, 2025, the Texas Securities Board (SSB) opened an investigation into possible violations of the Texas Securities Act by Community Capital Partners, LP ("CCP").

After months of thorough investigation, the SSB found: Across CCP's original marketing materials, which allowed it to accumulate roughly $40 million from hundreds of individuals, CCP solicited "accredited investors" to purchase instruments described as "limited partnerships" for $80,000 each, which purported to entitle the holder to one lot in EPIC City. Consistent with state law's definition of "securities," CCP described those instruments as "shares" and indicated that they provide an "interest in a limited partnership," namely a 0.1981% interest in CCP. *See* TEX. GOV'T CODE § 4001.068(a)(1)(A), (B). Alternatively, the instrument could be deemed to provide an interest in the property of CCP. *See* TEX. GOV'T CODE § 4001.068(a)(1)(N). CCP may not have made clear to investors that, rather than being free to alienate their shares, they may be forced "to hold [their] investment for years" until CCP approves a prospective buyer. *See* TEX. GOV'T CODE § 4007.203. And despite representing that shares are refundable, CCP's officers elsewhere claimed authority to pocket millions even if the development is never built. Even if the instruments are deemed to not constitute securities, then CCP may have misrepresented otherwise to purchasers or investors. *See Life Partners, Inc. v. Arnold*, 464 S.W.3d 660 (Tex. 2015); TEX. BUS. & COMM. CODE §§ 17.12, 17.46.

On October 14, 2025, I learned of general findings made from the Office of the Attorney General's parallel investigation. The SSB has not been provided with corresponding evidence for review. Based on the SSB's preliminary findings, I requested that the Attorney General take action as the Attorney General deemed appropriate. The SSB provided its investigative file to the Attorney General.

In accordance with Texas Government Code § 4007.152(c), I confirm and verify on information and belief the factual affirmations set out solely in Paragraphs 10 through 28 of the accompanying Petition in support of the requests for injunctive relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on this, the 5th day of December 2025.

Travis J. Iles
Texas Securities Commissioner
Declarant

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108817285
Filing Code Description: Plaintiff's Original Petition (OCA)
Filing Description: Verified Original Petition and Application for a Temporary Restraining Order
Status as of 12/8/2025 11:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Thomas Bevilacqua | | thomas.bevilacqua@oag.texas.gov | 12/8/2025 9:21:22 AM | SENT |
| Sarah Orr | | Sarah.Orr@oag.texas.gov | 12/8/2025 9:21:22 AM | SENT |

Copy from re:SearchTX